## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| JOHN PAUL STRAUSS, | ) | No. 12 B 10839 |
| | ) | |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| BANK OF COMMERCE & TRUST CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 A 943 |
| | ) | |
| JOHN PAUL STRAUSS, | ) | |
| | ) | |
| Defendant. | ) | Judge Goldgar |

### AMENDED MEMORANDUM OPINION[1/]

John Paul Strauss ran Banc Corp USA, a company engaged in equipment lease financing.

Some of the leases that it financed Banc Corp sold to banks as investments. In 2002, Banc Corp

began financing leases of medical equipment to federal medical facilities, most of them operated

by the Department of Veterans Affairs. Banc Corp sold five of the federal leases to banks in

Illinois and Texas, granting the banks security interests in the equipment. About a year later,

Banc Corp sold the same leases again to a Kansas bank, Bank of Commerce & Trust Company

("BOCT"), representing that the equipment was "free of all liens and encumbrances." Banc Corp

went out of business. The money BOCT had paid for the leases, nearly $420,000, disappeared.

After BOCT obtained a default judgment against Strauss in a civil action in Kansas,

---

[1/]     The amendments correct stylistic and typographical errors. There are no
substantive changes.

Strauss filed a chapter 7 bankruptcy case in this district, and BOCT commenced an adversary

proceeding against him.  BOCT alleged in Count I of its three-count adversary complaint that

Strauss owes BOCT a debt nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

The adversary proceeding went to trial earlier this year.  The only two witnesses who testified

were Strauss and Clint Lawrence, a BOCT officer.

   For the reasons discussed below – constituting the court's findings of fact and

conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure, Fed. R. Civ. P.

52(a) (made applicable by Fed. R. Bankr. P. 7052) – judgment will be entered in favor of BOCT

and against Strauss on Count I of the complaint, and Strauss's debt to BOCT will be declared

nondischargeable.  Count II of the complaint will be dismissed with prejudice.  Count III will be

dismissed for lack of jurisdiction.

## 1. Jurisdiction

   The court has subject matter jurisdiction of this case under 28 U.S.C. § 1334(a) and the

district court's Internal Operating Procedure 15(a).  The claims in Counts I and II are core

proceedings under 28 U.S.C. § 157(b)(2)(I).  As to the claim in Count III, the court has

jurisdiction to determine its jurisdiction.  *Bayo v. Napolitano*, 593 F.3d 495, 500 (7th Cir. 2010).

## 2. Facts

### a. Parties and Leases

   Strauss was president, chief executive officer, and sole shareholder of Banc Corp USA

located in Glenview, Illinois.  Incorporated in 1994, Banc Corp was engaged in commercial lease

financing.  Banc Corp's business grew rapidly, at least at first.  Over the years, Banc Corp was

involved in more than 600 transactions involving $35-40 million.  Despite the volume of its

business, however, Banc Corp's profit margin was small, roughly 1%. In 2005 or so, growth

was slowing, and the company owed more than $100,000 in employment taxes for the last

quarter of 2004 and all of 2005, a liability assessed against Strauss as the responsible person. As

far as the record shows, Banc Corp ceased operations around 2007.

Banc Corp's business involved providing financing for equipment leases. As Strauss

explained it, a vendor or distributor of certain costly equipment often seeks to sell the equipment

to a business that cannot afford to buy it outright. In that situation, the vendor or distributor

would seek out Banc Corp to facilitate the sale. Banc Corp would buy the equipment using its

own line of credit and then would lease the equipment to the business in question. Banc Corp

would obtain insurance on the equipment and file a UCC-1 financing statement.[2]

Some of the lease transactions were what Strauss called "single event" leases, by which

he meant one-shot deals. Other lease transactions involved a master lease: multiple pieces of

equipment were leased to multiple businesses, and all of the transactions were subject to a single

governing lease.

When a lease transaction involved $25,000 or less, Banc Corp would retain the lease

itself. When a lease transaction involved more than $25,000, Banc Corp would sell the lease to a

bank as an investment.[3] Whether the lease was retained or sold, Banc Corp would almost always

be responsible for billing the buyer-lessee and would set up an automatic funds transfer, with the

---

[2]      The legal issue that usually arises out of a transaction like this is whether the lease
is a true lease or a disguised security agreement. *See, e.g., In re United Air Lines, Inc.*, 447 F.3d
504 (7th Cir. 2006). That is not an issue here. The sole issue here is fraud.

[3]      Technically, Banc Corp would assign its rights under the lease to the investor
bank. In equipment lease financing, the assignment is sometimes described informally as a
"sale." *See, e.g., Warnock Auto. Grp., Inc. v. Goldin (In re First Interregional Advisors Corp.)*,
218 B.R. 722, 724 (D.N.J. 1997).

payments remitted either to Banc Corp or directly to the investor bank.

When Banc Corp sought to sell a lease to a bank, it would do so through Lance Dominique, a broker in Barrington, Illinois. Precisely who Dominique represented in these transactions is unclear.[4]

One of the investor banks that bought leases from Banc Corp as investments was BOCT. BOCT is a small bank with thirteen employees located in Wellington, Kansas, a town of around 7,500 people south of Wichita.[5] From 1998 through 2005, BOCT purchased more than twenty leases from Banc Corp.

### b. IRIS Leases

Sometime in 2002, BOCT introduced Banc Corp to a new vendor, International Remote Imaging Systems, Inc. ("IRIS"). IRIS manufactured automated urinalysis machines and related equipment that it sold to federal government medical facilities. IRIS had sold its machines and equipment to the government through lease financing, and banks had bought the IRIS leases as investments. These banks included BOCT: BOCT bought its first IRIS lease in 1999.

In November 2002, Banc Corp and IRIS entered into a "Master Purchase Agreement." Under the Master Purchase Agreement, IRIS would lease urinalysis machines and related

---

[4]     Clint Lawrence, a BOCT vice president, testified that BOCT had used Dominique as a broker in more than seventy-five transactions, and Dominique considered BOCT his client. Strauss, similarly, testified that Dominique would refer to the banks as his "customers," and Dominique would call Strauss looking for investment opportunities he could take to the banks. At the same time, Strauss testified that Banc Corp had "used" Dominique for more than 200 transactions. On those transactions, Strauss said, "we approached Lance, talked to him about the detail of the transaction, and he then took that transaction and sold it to various banks." In his deposition from another action, Dominique corroborated Strauss's testimony, agreeing that Banc Corp "use[d]" him to "solicit" and "place" leases.

[5]     The court may take judicial notice of "geographic facts, including location." *United States v. Mendell*, 447 F.2d 639, 641 (7th Cir. 1971).

equipment to the government and then would sell the equipment and sell and assign the lease

payments (each of the leases had a sixty-month term) to Banc Corp. IRIS agreed to provide Banc

Corp with all necessary documentation for the transaction, including the "federal lease

agreement," properly executed. IRIS agreed to grant Banc Corp a security interest in the leased

equipment. And IRIS agreed to pay Banc Corp the balance due under the lease if the lessee

defaulted in certain ways. Banc Corp, in turn, was made responsible for invoicing the lessee.

Banc Corp was also given the right to reassign its rights in the equipment, the lease, and the lease

payments.

All told, Banc Corp did ten to fifteen IRIS lease transactions. Because the transactions

involved larger dollar amounts, however, Banc Corp did not retain any of the leases. All were

sold to investor banks.

Banc Corp's sale of IRIS leases – at least the five leases involved here – followed the

same general pattern. Strauss would have detailed discussions with Dominique about the lease to

be sold, the placement for sale occurring only as "the culmination of numerous discussions." At

the conclusion of those discussions, Banc Corp would send a fax to Dominique describing the

lessee, leased equipment, lease terms, and commission to Dominique, and submitting the lease

for placement. Dominique would then send to potential investor banks a document entitled

"Federal Offering." The Federal Offering again described the lessee, leased equipment, and lease

terms. When a bank expressed interest in the offering, Dominique would send the bank a letter

(a copy of which was also sent to Banc Corp) confirming "the lease opportunity" and noting that

the transaction was subject to the bank's acceptance of the "closing documentation."

Banc Corp would then send the investor bank what Strauss called a "funding letter." The

funding letter forwarded the documents for the sale of the lease and instructed the bank upon its

review and approval of the sale to wire funds in a designated amount to Banc Corp's account at

The Northern Trust Company. Although there was some variation from sale to sale, the

documents listed in the funding letter included a document described as an "Agreement" with a

reference number and a document described as a "Contract" with another reference number.

(Which of these was the actual lease is unclear; none of the Agreements or Contracts is in the

record.) The documents also included an assignment of the lease from IRIS to Banc Corp, an

assignment of the lease from Banc Corp to the investor bank, and either a UCC-1 financing

statement listing the investor bank as the secured party (since the assignment from Banc Corp

also granted the bank a security interest in the leased equipment) or proof that Banc Corp had

filed the UCC-1.

Payments under the IRIS leases worked differently from payments under other leases

Banc Corp sold to investor banks. In other transactions, there were no invoices. Payments were

automatically transferred electronically from the lessee to Banc Corp, and Banc Corp remitted

the payments electronically to the investor bank. Under the IRIS leases, Banc Corp also received

the lease payments and remitted them, but the payments varied depending on the number of tests

run with the leased machine. Consequently, Banc Corp invoiced the government manually, and

no invoice could be generated until the particular medical center reported the number of tests.

Complicating matters further, Banc Corp remitted only part of the lease payment to the investor

bank. The rest Banc Corp remitted to IRIS as reimbursement for "consumables" – materials IRIS

supplied with the machine that were used up during the testing.

### c. The Five Double-Sold Leases

### i. The Salt Lake Lease

In September 2003, Banc Corp placed for sale through Dominique an IRIS lease with the

V.A. Medical Center-Salt Lake in Utah. In February 2004, Banc Corp sent a funding letter in

connection with the Salt Lake lease to People's National Bank of Kewanee in Kewanee, Illinois

(the "Kewanee Bank"). Enclosed with the funding letter was an assignment from IRIS to Banc

Corp of the Salt Lake lease. Apparently, no assignment from Banc Corp to the Kewanee Bank

was ever executed. Strauss acknowledged that there should have been an executed assignment,

and he agreed that Banc Corp and the Kewanee Bank treated the lease as if it had been properly

assigned. The Kewanee Bank paid Banc Corp $86,294.49 for the Salt Lake lease, and Banc Corp

remitted the lease payments to the bank. Banc Corp and the Kewanee Bank also treated the lease

as if Banc Corp had granted Kewanee Bank a security interest in the leased equipment, because

Banc Corp filed a UCC-1 financing statement showing the Kewanee Bank as the secured party.

About eleven months later, Banc Corp apparently placed the same Salt Lake lease

because Dominique sent out a Federal Offering offering the same lease for sale. On March 9,

2005, Dominique sent then-chairman of BOCT, W.C. Long, Jr., a letter confirming the lease

opportunity. On March 18, 2005, Banc Corp sent a funding letter to BOCT in connection with

the Salt Lake lease. Enclosed with the letter was the assignment of the Salt Lake lease from IRIS

to Banc Corp as well as an assignment of the lease from Banc Corp to BOCT. The Banc Corp

assignment, which Strauss signed, granted BOCT a security interest in the leased equipment.

The assignment also represented that the "lessor," meaning Banc Corp, was "the owner" of the

leased equipment, and the equipment was "free of all liens and encumbrances." Banc Corp filed

a UCC-1 financing statement on the equipment showing BOCT as the secured party.

Strauss did not tell BOCT that the Salt Lake lease had already been assigned to the

Kewanee Bank, nor was the Kewanee Bank's president told that the lease had been assigned to

BOCT. No evidence at trial showed either that the Kewanee Bank executed a release of its

assignment or its security interest, or that the Kewanee Bank reassigned the Salt Lake lease to

BOCT or to Banc Corp.

BOCT paid Banc Corp the $76,460.53 called for in the funding letter. The funds were

deposited in Banc Corp's account at Northern Trust, an account Strauss alone controlled. They

were not paid to the Kewanee Bank. Strauss could not say what happened to them.

### ii. The Houston Lease

In October 2003, Banc Corp placed for sale through Dominique an IRIS lease with the

V.A. Medical Center-Houston. Dominique sent out a Federal Offering for the lease. On October

2, 2003, Dominique sent the First State Bank of Livingston, Texas (the "Livingston Bank"), a

letter confirming the lease opportunity. Some months later, on March 19, 2004, Banc Corp sent

the Livingston Bank a funding letter in connection with the Houston lease. Enclosed with the

letter was an assignment of the Houston lease from IRIS to Banc Corp as well as an assignment

of the lease from Banc Corp to the Livingston Bank. The Banc Corp assignment, which Strauss

signed, not only assigned the lease but granted the Livingston Bank a security interest in the

leased equipment, and a UCC-1 financing statement was filed on the equipment with the

Livingston Bank as the secured party. The Livingston Bank paid Banc Corp $113,896.65 for the

Houston lease.

On February 1, 2005, the president of the Livingston Bank notified Strauss by e-mail that

the Houston lease was three months in arrears.

One week later, on February 8, 2005, Banc Corp sent Dominique a fax submitting the

same Houston lease for placement. Dominique sent out a Federal Offering for the lease, and on

February 9, 2005, he sent BOCT a letter confirming the lease opportunity. The next day, Banc

Corp sent a funding letter to BOCT in connection with the Houston lease. Enclosed with the

-8-

letter was the assignment of the Houston lease from IRIS to Banc Corp as well as an assignment of the lease from Banc Corp to BOCT. The assignment, which Strauss signed, granted BOCT a security interest in the leased equipment. The assignment also represented that the "lessor," meaning Banc Corp, was "the owner" of the leased equipment, and the equipment was "free of all liens and encumbrances." Banc Corp filed a UCC-1 financing statement on the equipment with BOCT as the secured party.

Strauss did not tell BOCT that the Houston lease had already been assigned to the Livingston Bank, nor was the president of the Livingston Bank told that the lease had been assigned to BOCT. No evidence at trial showed either that the Livingston Bank executed a release of its assignment or its security interest, or that the Livingston Bank reassigned the Houston lease to BOCT or to Banc Corp.

BOCT paid Banc Corp the $102,948.62 called for in the funding letter. The funds were deposited in the Banc Corp account Strauss controlled at Northern Trust. The funds were not paid to the Livingston Bank. Asked what happened to the funds, Strauss answered: "I don't know."

### iii.  The Gallup Indian Lease

In January 2004, Banc Corp placed for sale through Dominique an IRIS lease with the Gallup Indian Medical Center.[6/] The same day the lease was placed for sale, Dominique sent the

---

[6/]    The parties treated each of the medical centers as if they were V.A. medical centers. The web site of the Gallup Indian Medical Center (of which the court can take judicial notice, *see Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) reveals that it is operated by the federal government's Indian Health Service rather than by the V.A. Since the parties drew no distinction at trial between the Gallup medical center and the V.A. medical centers, and since the lease transaction with the Gallup medical center appears to have been substantially the same as the V.A. transactions, it makes no difference that a different federal agency was the lessee.

Livingston Bank a letter confirming the lease opportunity.  On April 9, 2004, Banc Corp sent the

Livingston Bank a funding letter in connection with the Gallup lease.  Enclosed with the letter

was an assignment of the Gallup lease from IRIS to Banc Corp as well as an assignment of the

lease from Banc Corp to the Livingston Bank.  The Banc Corp assignment, which Strauss signed,

both assigned the lease and granted the Livingston Bank a security interest in the leased

equipment.  A UCC-1 financing statement was filed on the equipment with the Livingston Bank

as the secured party.  The Livingston Bank paid Banc Corp $88,017 for the Gallup lease.

On February 1, 2005, the president of the Livingston Bank notified Strauss by e-mail that

the Gallup lease was three months in arrears.

Less than a week later, on February 7, 2005, Banc Corp sent Dominique a fax submitting

the same Gallup lease for placement.  Dominique sent out a Federal Offering for the lease and on

February 8, 2005, sent BOCT a letter confirming the lease opportunity.  That same day, Banc

Corp sent a funding letter to BOCT in connection with the Gallup lease.  Enclosed with the

funding letter was the assignment of the Gallup lease from IRIS to Banc Corp.  Also enclosed

was an assignment of the lease from Banc Corp that should have assigned the lease to BOCT but

instead assigned it to Dominique & Associates.  Lawrence noticed the discrepancy and spoke to

Dominique and Strauss about it.  All agreed the name of the assignee was a typographical error.

BOCT was promised a corrected version of the assignment, but none was ever sent.

The assignment, which Strauss signed, granted the assignee a security interest in the

leased equipment.  It also represented that the "lessor," meaning Banc Corp, was "the owner" of

the leased equipment, and the equipment was "free of all liens and encumbrances."  Whether a

UCC-1 financing statement was ever filed with BOCT as the secured party is unclear.  The

funding letter described the financing statement as "to be faxed."  Several financing statements

were introduced into evidence, but they are dated 2007 and for some reason show IRIS rather than the Gallup Indian Medical Center as the debtor.

Strauss did not tell BOCT that the Gallup lease had already been assigned to the Livingston Bank, nor was the president of the Livingston Bank told that the lease had been assigned to BOCT or anyone else. No evidence at trial showed either that the Livingston Bank executed a release of its assignment or its security interest, or that the Livingston Bank reassigned the Gallup lease to BOCT, Banc Corp, to anyone else.

BOCT paid Banc Corp the $79,278.62 called for in the funding letter. There was no evidence that Banc Corp ever returned the money because the intent was not to assign the lease to BOCT. The funds were deposited in the Banc Corp account Strauss controlled at Northern Trust. The funds were not paid to the Livingston Bank. Asked what happened to them, Strauss answered: "Don't know."

### iv. The Albuquerque Lease

On March 1, 2004, Banc Corp placed for sale through Dominique an IRIS lease with the V.A. Medical Center-Albuquerque. Apparently that same day, Dominique sent out a Federal Offering for the lease and also sent the Livingston Bank a letter confirming the lease opportunity. On May 18, 2004, Banc Corp sent the Livingston Bank a funding letter for the lease. Enclosed with the letter was an assignment of the Albuquerque lease from IRIS to Banc Corp as well as an assignment of the lease from Banc Corp to the Livingston Bank. The Banc Corp assignment, which Strauss signed, not only assigned the lease but also granted the Livingston Bank a security interest in the leased equipment. A UCC-1 financing statement was filed on the equipment showing the Livingston Bank as the secured party. The Livingston Bank paid Banc Corp $86,712 for the Albuquerque lease.

On February 16, 2005, Dominique notified Strauss by e-mail that the Albuquerque lease was in arrears.

That same day, Banc Corp sent Dominique a fax submitting the same Albuquerque lease for placement. Dominique sent out a Federal Offering for the lease and on March 8, 2005, sent BOCT a letter confirming the lease opportunity. On March 18, 2005, Banc Corp sent a funding letter to BOCT. Enclosed with the letter was the assignment of the Albuquerque lease from IRIS to Banc Corp as well as an assignment of the lease from Banc Corp to BOCT. The Banc Corp assignment, which Strauss signed, granted BOCT a security interest in the leased equipment. The assignment also represented that the "lessor," Banc Corp, was "the owner" of the leased equipment, and the equipment was "free of all liens and encumbrances." Banc Corp filed a UCC-1 financing statement on the equipment with BOCT as the secured party.

Strauss did not tell BOCT that the Albuquerque lease had previously been assigned to the Livingston Bank, nor was the president of the Livingston Bank told about the assignment to BOCT. There was no evidence that the Livingston Bank executed a release of its assignment or its security interest, nor was there evidence that the Livingston Bank reassigned the Albuquerque lease to BOCT or to Banc Corp.

BOCT paid Banc Corp the $79,463.71 called for in the funding letter. The funds were deposited in the Banc Corp account that Strauss controlled at Northern Trust. Asked what happened to the funds, Strauss answered: "Don't know."

### v. The North Texas Lease

Sometime in 2004, apparently, Dominique sent out a Federal Offering for an IRIS lease with the V.A. Medical Center-North Texas. On July 15, 2004, Banc Corp sent the Livingston Bank a funding letter for the North Texas lease (a lease the parties also call the "Dallas" lease).

-12-

Enclosed with the funding letter was an assignment of the North Texas lease from IRIS to Banc Corp as well as an assignment of the lease from Banc Corp to the Livingston Bank. The assignment, which Strauss signed, assigned the lease and also granted the Livingston Bank a security interest in the leased equipment. A UCC-1 financing statement was filed on the equipment with the Livingston Bank as the secured party. The Livingston Bank paid Banc Corp the $89,260.88 called for in the funding letter.

On February 16, 2005, Dominique notified Strauss by e-mail that the North Texas lease was in arrears.

That same day, Banc Corp placed for sale with Dominique the same North Texas lease. Dominique sent out a Federal Offering for the lease and on February 28, 2005, sent BOCT a letter confirming the lease opportunity. On March 2, 2005, Banc Corp sent BOCT a funding letter in connection with the North Texas lease. Enclosed with the funding letter was an assignment from IRIS to Banc Corp of the North Texas lease as well as an assignment of the lease from Banc Corp to BOCT. The Banc Corp assignment, which Strauss signed, granted BOCT a security interest in the leased equipment. Banc Corp filed a UCC-1 financing statement on the equipment with BOCT as the secured party.

Strauss did not tell BOCT that the North Texas lease had already been assigned to the Livingston Bank, nor was the president of the Livingston Bank told that the lease had been assigned to BOCT. No evidence was adduced at trial showing either that the Livingston Bank executed a release of its assignment or its security interest, or that the Livingston Bank reassigned the North Texas lease to BOCT or to Banc Corp.

BOCT paid Banc Corp the $80,948.39 called for in the funding letter. The funds were deposited into the Banc Corp account that Strauss controlled at Northern Trust. The funds were

-13-

not paid to the Livingston Bank. Strauss could not say what happened to them.

### d. The Double Sales Discovered

Although BOCT received some payments from Banc Corp on the five IRIS leases it was assigned, Lawrence described the payments as "sporadic." Lawrence had repeated conversations with Dominique and with Strauss about problems with lease payments. Strauss, Lawrence said, would promise to check into the missed payments and get back to him – and Lawrence added that Strauss would call back to let him know when payment could be expected.

In September 2007, the concern finally became great enough that Lawrence took action, contacting the V.A. himself "to see where the payment stream was going or if there was a payment stream." The V.A. directed him to the Livingston Bank. On speaking with the Livingston Bank, Lawrence learned that the Livingston Bank had an interest in four of the leases. The Livingston Bank sent him copies of its files. Lawrence also contacted the Kewanee Bank and determined that the Kewanee Bank had an interest in the fifth lease. The Kewanee Bank sent him a copy of its file. After reviewing the Livingston and Kewanee Bank files, Lawrence spoke with Strauss. The content of that conversation was not revealed.

BOCT received no payments on any of the five leases after May 2007. BOCT's original investment in the leases was $419,099.87. As of May 2007, BOCT was still owed $323,287.02.

BOCT sued IRIS and Dominique in the district court in Kansas. BOCT also sued Strauss and Banc Corp separately in the same court. The IRIS action was settled, and BOCT was paid $178,011.73. The Dominique action went to trial, and a jury returned a verdict in BOCT's favor, awarding $323,287.62 in compensatory damages and $176,712.98 in punitive damages.[2] There

---

[2]    Although the Dominique action was not addressed at trial in any detail, the outcome is evident from the docket in the action. This court can take judicial notice of records of

was no evidence that BOCT has collected anything on the judgment against Dominique.  BOCT

settled the action against Strauss, but when Strauss immediately defaulted on the settlement

agreement, BOCT amended its complaint and obtained a default judgment against both Strauss

and Banc Corp for $400,790.31.  Despite the settlements and judgments, Strauss does not

contend that BOCT has recovered its full investment in the leases.

### e. The Bankruptcy Case and Adversary Proceeding

In March 2012, Strauss filed a chapter 7 bankruptcy case.  BOCT then filed an adversary

proceeding against him asserting that he owes BOCT a nondischargeable debt.  BOCT's

complaint has three counts.  Count I alleges that Strauss's debt is nondischargeable under section

523(a)(2)(A) as a debt for money obtained by false representation, false pretenses, or actual

fraud.  BOCT claims fraud arising out of both the double-sold leases and the settlement

agreement in the Kansas action.  Count II alleges that Strauss owes a debt nondischargeable

under section 523(a)(6) arising out of a willful and malicious intent to injure BOCT.  Count III

(mistakenly numbered Count IV) requests a determination of the precise amount of Strauss's

debt to BOCT.

At the beginning of the trial, the court ruled that the section 523(a)(6) claim in Count II

and the claim in Count I arising out of the settlement agreement had been waived.  The final

pretrial order for this proceeding required a trial brief from each side and declared that "any legal

claim, theory, or argument not raised and thoroughly discussed in a trial brief with appropriate

citations to legal authority will be deemed waived."  BOCT's trial brief did not mention the

---

other courts in related matters.  *See Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996); *Philips Med.
Sys. Int'l, B.V. v. Bruetman*, 982 F.2d 211, 215 n.2 (7th Cir. 1992); *SG & Co. N.E., LLC v. Good*,
461 B.R. 532, 535 n.3 (Bankr. N.D. Ill. 2011).

adversary complaint's section 523(a)(6) claim or the section 523(a)(2)(A) claim concerning the settlement agreement.

The court also ruled that it lacked subject matter jurisdiction to decide Count III, the request to liquidate Strauss's debt. *See Condon Oil Co. v. Wood (In re Wood)*, 503 B.R. 705, 709-10 (Bankr. W.D. Wis. 2013). Whether bankruptcy courts can liquidate debts in nondischargeability proceedings is controversial. Some courts have concluded they can. *See, e.g., Dragisic v. Boricich (In re Boricich)*, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011). In *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1508 (7th Cir. 1991), the court of appeals for this circuit specifically held that bankruptcy courts have the power to liquidate debts in proceedings under section 523(a). As *Wood* noted, however, *Hallahan* was decided well before *Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594 (2011). *Wood*, 503 B.R. at 709; *see also DeAngelis v. Antonelli (In re Antonelli)*, Nos. 08-13903, 09-1013, 2011 WL 5509494, at *1 (D.R.I. Nov. 10, 2011). *Wood* is more consistent with *Stern*'s jurisdictional approach.[8]

The only question that was tried, then, and the only question to be decided, is whether Strauss owes BOCT a debt nondischargeable under section 523(a)(2)(A) based on the double-sold leases.

### 3. Discussion

He does. The evidence demonstrated that Strauss induced BOCT to buy leases through knowingly and intentionally false representations and omissions. As his defense, Strauss claimed

---

[8]    In a recent unpublished decision, the court of appeals acknowledged *Hallahan*, noted the decision was "pre-*Stern*," but declined to resolve the jurisdictional question, remarking only that it is "unclear whether *Stern* . . . restricts a bankruptcy court's power to resolve a creditor's state-law claim when the court decides whether that claim is nondischargeable." *Lee v. Christenson*, 558 F. App'x 674, 676 (7th Cir. 2014).

-16-

ignorance and blamed others for what had happened, but his testimony was not convincing.

Section 523(a) of the Code excepts certain debts from the discharge that section 727 normally grants to a debtor. 11 U.S.C. § 523(a). Because the goal of bankruptcy is to give the debtor a fresh start, *Local Loan Co. v. Hunt,* 292 U.S. 234, 244-45 (1934), debts are presumed dischargeable and will be discharged unless proved non-dischargeable, *Fischer Inv. Capital, Inc. v. Cohen (In re Cohen),* 507 F.3d 610, 612 (7th Cir. 2007); *In re Morris,* 223 F.3d 548, 552 (7th Cir. 2000). The burden of proving an exception to discharge consequently rests with the objecting creditor, who must demonstrate non-dischargeability by a preponderance of the evidence. *Follett Higher Educ. Grp., Inc. v. Berman (In re Berman),* 629 F.3d 761, 765 (7th Cir. 2011); *Goulet v. Educ. Credit Mgmt. Corp.,* 284 F.3d 773, 777 (7th Cir. 2002).

Section 523(a)(2)(A) of the Code excepts from discharge "(a) . . . any debt (2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." Although some courts have applied a single test for determining nondischargeability under this section, it actually describes three separate grounds for holding a debt to be nondischargeable: false pretenses, false representation, and actual fraud. *National Union Fire Ins. Co. of Pittsburgh, N.A. v. Krause (In re Krause),* ___ B.R. ___, ___, 2014 WL 4948146, at *4 (N.D. Ill. Sept. 30, 2014); *Parkway Bank & Trust v. Casali (In re Casali),* 517 B.R. 835, 841 (Bankr. N.D. Ill. 2014).

BOCT's claim here is a false representation claim. To prove such a claim, a creditor must show (1) the debtor made a false representation he either knew was false or made with reckless disregard for the truth; (2) the debtor made the false representation with an intent to deceive or defraud; and (3) the creditor justifiably relied on the false representation. *In re Davis,*

-17-

638 F.3d 549, 553 (7th Cir. 2011); *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010).  A

debtor's fraudulent omission will also support a false representation claim.  *Davis*, 638 F.3d at

553; *Ojeda*, 599 F.3d 717.  Indeed, a "deliberately misleading omission" amounts to "the same

thing" as a "deliberate misrepresentation."  *McClellan v. Cantrell*, 217 F.3d 890, 892 (7th Cir.

2000); *see also Sullivan v. Glenn (In re Glenn)*, 502 B.R. 516, 530 (Bankr. N.D. Ill. 2013)

(noting that "a debtor's silence regarding a material fact can constitute a false representation

under § 523(a)(2)(A)" (internal quotation omitted)), *aff'd*, ___ B.R. ___, 2014 WL 4435738

(N.D. Ill. Sept. 9, 2014).

The evidence at trial satisfied each of these elements.

### a.  False Representation or Material Omission

First, the evidence showed plainly that Strauss made both material omissions and false

representations in connection with the sale of the five IRIS leases to BOCT.

Strauss failed to tell BOCT that the leases Banc Corp was selling had already been sold to

other banks – the Kewanee Bank in the case of the Salt Lake lease and the Livingston Bank in the

case of the other four.  In the assignments, Strauss also falsely represented that the leased

equipment was "free of all liens and encumbrances."  The representation was false because Banc

Corp had previously granted the Kewanee and Livingston Banks security interests in the

equipment.[9]

---

[9]      The misrepresentation that the equipment was "free of all liens and
encumbrances" could also be considered an omission, in the sense that Strauss failed to tell
BOCT about the liens actually encumbering the equipment.  As courts in securities fraud cases
have observed, "[t]he categories of 'omission' and 'misrepresentation' are not mutually
exclusive. All misrepresentations are also nondisclosures, at least to the extent that there is a
failure to disclose which facts in the representation are not true." *Little v. First Cal. Co.*, 532
F.2d 1032, 1304 n.4 (9th Cir. 1976); *In re Jiffy Lube Sec. Litig.*, 772 F. Supp. 258, 267 (D. Md.
1991); *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 97 (S.D.N.Y. 1981).  Since it

Although there was no question that the leases were "double-sold" (Strauss's own term),

Strauss resisted the notion that he had made any misrepresentations or omissions. He conceded

that Banc Corp had sold each lease to two different banks but nonetheless maintained that Banc

Corp had neither "sold" the leases nor had any communications at all with BOCT. Dominique,

Strauss said, had sold the leases, and he alone had dealt with BOCT.

The evidence did not remotely support these contentions. Banc Corp owned the rights

under the IRIS leases, not Dominique. Dominique could not have transferred them had he

wanted to. Banc Corp also sold those rights. There was no dispute that Strauss, not Dominique,

executed the assignments of the leases to the Kewanee and Livingston Banks and then executed

the assignments of the same leases to BOCT. There was equally no dispute that the Kewanee

and Livingston banks paid Banc Corp, not Dominique, for the assignments, and BOCT then paid

Banc Corp, not Dominique, for the same leases. The payments were all deposited in Banc

Corp's account at Northern Trust, and Strauss acknowledged that Banc Corp was paid twice for

the same leases. The lease assignments here were transactions between BOCT and Banc Corp,

not BOCT and Dominique.[10]

As for communications with BOCT, Strauss signed each of the funding letters sent to

BOCT (or authorized their signing) but never mentioned in the letters either that the transactions

concerned leases already sold to other banks or that the leased equipment was subject to the

security interests of those banks. Strauss admitted at trial that he never revealed the previous

---

makes no difference whether Strauss made a misrepresentation or omission, the "free of all liens"
statement in the assignments to BOCT will be considered a misrepresentation.

[10]    Because the omissions and misrepresentations here were Strauss's omissions and
misrepresentations, not Dominique's, there is no need to address the difficult question of whose
agent Dominique was.

assignments and liens to BOCT in any fashion. Strauss also signed each of the assignments to

BOCT falsely representing that the leased equipment was free of all liens and encumbrances. He

admitted sending the assignments to BOCT along with the other documentation. Strauss cannot

evade liability here by claiming that he had no dealings with BOCT and Dominique was

somehow at fault.

### b. Knowledge of Falsity

Next, the evidence showed that the false representations and omissions Strauss made in

his dealings with BOCT were made knowingly.

Again, Strauss signed (or authorized to be signed) the funding letters to the Kewanee and

Livingston banks, and he also signed the assignments of the leases from Banc Corp to those

banks. Less than a year later, Strauss signed the transmittals in which Banc Corp placed the

same leases for sale with Dominique. Strauss also signed (or authorized to be signed) the

funding letters from Banc Corp to BOCT for the same leases. And he signed the assignments of

those same leases from Banc Corp to BOCT representing that the leased equipment was free of

all liens and encumbrances.

Strauss is well-educated, with an M.A. in Economics from the University of Iowa. At the

time of the transactions with BOCT, he had more than fifteen years' experience in the equipment

leasing industry. Because he executed the funding letters and assignments to the Kewanee and

Livingston Banks, Strauss knew the leases Banc Corp was selling to BOCT had already been

sold and also knew Banc Corp had granted those banks security interests in the leased equipment.

Strauss never claimed at trial not to have known about the earlier sales or the granting of security

interests.

### c. Fraudulent Intent

The evidence showed that Strauss not only made the omissions and misrepresentations to

BOCT knowingly, he made them with fraudulent intent.[11]

Proof of intent depends on the debtor's subjective intention at the time the representation

or omission was made. *Attorneys' Title Guaranty Fund v. Wolf (In re Wolf)*, 519 B.R. 228, 248

(Bankr. N.D. Ill. 2014); *Casali*, 517 B.R. at 843. Because direct proof of intent is rarely

available, however, intent can be proved through circumstantial evidence. *Casali*, 517 B.R. at

843; *Sargis v. Aguilar (In re Aguilar)*, 511 B.R. 507, 513 (Bankr. N.D. Ill. 2014). Thus, where

the debtor knowingly or recklessly made false representations that he knew or should have

known would induce another to act, the court may infer fraudulent intent. *In re Sheridan*, 57

F.3d 627, 633 (7th Cir. 1995); *Meyer v. Walters (In re Walters)*, Nos. 14-30067, 14-3035, 2014

---

[11]    BOCT argues that fraudulent intent is presumed because Strauss was running a
Ponzi scheme at Banc Corp. BOCT is right that a Ponzi scheme is presumptively fraudulent, at
least for purposes of fraudulent transfer law. *See Peterson v. Enhanced Investing Corp.
(Cayman) Ltd. (In re Lancelot Investors Fund, L.P.*, 467 B.R. 643, 654 (Bankr. N.D. Ill. 2012),
*aff'd sub nom. Peterson v. Somers Dublin, Ltd.*, 729 F.3d 741 (7th Cir. 2013). But BOCT is
wrong in calling Banc Corp a Ponzi scheme. A Ponzi scheme is

> one in which funds obtained from new investors are used to satisfy
> interest and principal obligations due on earlier investors' notes
> (and usually to line the pockets of the scheme's perpetrators).
> Such a scheme requires an ever-larger circle of new investors to
> keep it afloat, and thus almost invariably ends in disaster.

*Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 613 n.3 (7th Cir. 1996). A critical feature
is that the scheme is "not really supported by any underlying business venture." *Martino v.
Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 437 n.17 (Bankr. N.D. Ill. 1995). No
evidence here showed that Banc Corp was other than a genuine business venture whose
transactions were generally above board. *Cf. Gold v. Tennessee Bank (In re Taneja)*, Nos. 08-
13293-RGM, 10-1225, 2012 WL 3073175, at *7 (Bankr. E.D. Va. July 30, 2012) (refusing to
find mortgage broker ran a Ponzi scheme where the company was " legitimate" and no evidence
showed that "all or most or even a high percentage of the mortgages made were fraudulent"),
*aff'd*, 743 F.3d 423 (4th Cir. 2014).

WL 5426644, at *3 (Bankr. S.D. Ill. Oct. 23, 2014); *Santiago v. Hernandez (In re Hernandez)*,

452 B.R. 709, 721 (Bankr. N.D. Ill. 2011).

Strauss plainly intended to deceive BOCT. He knew or should have known BOCT would

not have bought the leases had it realized they had already been sold to other banks. No one

knowingly buys property from a person who does not own it. A person who sells property he

does not own, whether he previously sold the property to someone else or never owned it in the

first place, and who conceals his lack of ownership, acts with an intent to deceive. *See*

*Schlechter v. Hoggarth (In re Hoggarth)*, Nos. 09-30390, 09-7020, 2009 WL 5034132, at *5

(Bankr. D.N.D. Dec. 15, 2009) (finding debt nondischargeable under section 523(a)(2)(A) where

debtor sold creditor fertilizer tanks he did not own and failed to disclose the true owner); *cf.*

*United States v. Behr*, 33 F.3d 1033, 1036 (8th Cir. 1994) (describing multiple sales of the same

pay telephones to different investors as "[p]erhaps most telling of [the defendant's] intent to

defraud"). Strauss's only reason for not disclosing that the leases had already been sold was to

induce BOCT to buy them.

Strauss also knew or should have known BOCT would not have bought the leases had it

known the representations that the leased equipment was free of all liens and encumbrances were

false because other banks had previously been granted security interests in the equipment,

security interests to which BOCT's security interests were inferior. Just as Strauss had no

legitimate reason to conceal the previous sales of the leases, he had no legitimate reason to

represent falsely that the leased equipment was unencumbered. Again, his only reason was to

induce BOCT to buy the leases. *See Gross v. Osborne (In re Osborne)*, ___ B.R. ___, 2014 WL

5527883, at *6 (Bankr. D.N.M. Oct. 31, 2014) (finding debt nondischargeable under section

523(a)(2)(A) where debtors induced builder to provide construction financing by misrepresenting

that their property was unencumbered).

Although Strauss conceded the five leases here were "double sold," he insisted at trial that he had no fraudulent intent. It was his position that the leases were supposed to have been *reassigned* from the Kewanee and Livingston Banks to BOCT. To that end, Strauss said, the money BOCT paid Banc Corp for the leases should have been forwarded to the Kewanee and Livingston Banks, and he specifically directed his "operations person" to pay those banks once funds were received. According to Strauss, he had no idea the leases had not been reassigned and the other banks paid until BOCT sued him. When he learned about the double sales, he fired Banc Corp's bookkeeper, Jackie Miller, to whom Strauss was also married. They later divorced. The implication was that Miller, not Strauss, was responsible for the entire debacle and may even have made off with the money.

Strauss's effort to minimize his role and shift blame to his ex-wife will not wash. Apart from his own self-serving testimony, the record is devoid of evidence that Strauss meant to reassign the leases. There was no evidence that reassignment was ever discussed either with BOCT or with the other banks, and Strauss admitted he had no evidence that the Kewanee and Livingston banks were even interested in reassignment. In affidavits that Strauss himself introduced, the presidents of the Kewanee and Livingston banks stated they knew nothing about the lease sales to BOCT until 2007. There was likewise no evidence that documentation for a reassignment was ever prepared. Lawrence testified without contradiction that if the sales to BOCT had been reassignments, the documentation, including releases, would have come from the other banks, not from Banc Corp, and BOCT would have paid those banks directly. Although Strauss claimed the funds from BOCT should have been sent to the Kewanee and Livingston banks, he admitted he never contacted those banks to see if they had been paid off.

Strauss's claim that the lease sales to BOCT were reassignments gone awry was not credible.

More important, the reassignment story would make no difference even if it had been credible. Strauss mistakenly believes that he lacked fraudulent intent because (he says) he never meant to harm BOCT. But fraudulent intent under section 523(a)(2)(A) means intent to *deceive*, *Ojeda*, 599 F.3d at 717, in the sense of intent to induce reliance, *Sheridan*, 57 F.3d at 633. Intent does not mean intent to *harm*. *Dancor Constr., Inc. v. Haskell (In re Haskell)*, 475 B.R. 911, 922 (Bankr. C.D. Ill. 2012) (noting that the intent element "requires proof of an intent to deceive, not an intent to harm, which are two different things.").

It would not matter, then, if Strauss really had meant for the leases to be reassigned and had never intended to cheat BOCT out of any money. What matters is that he intended to induce BOCT to buy the leases. *See, e.g., Rainier Title Co. v. Demarest (In re Demarest)*, 176 B.R. 917, 920 (Bankr. W.D. Wash. 1995) (rejecting debtors' assertion that they lacked fraudulent intent in failing to disclose title error that caused them to be overpaid for the sale of their residence because they "intended to pay back the money" from another closing); *United States v. Spicer (In re Spicer)*, 155 B.R. 795, 802 (Bankr. D.D.C. 1993) (rejecting argument from debtor who admitted submitting false statements to induce the government to insure mortgages that he lacked the requisite intent because he "did not intend to cause the government losses"), *aff'd*, 57 F.3d 1152 (D.C. Cir. 1995). That intent was readily evident here.[12]

---

[12]     Strauss also maintained that the IRIS transactions were wholly unlike anything Banc Corp had handled before. "We were absolutely clueless," he said, "in terms of what was involved . . . in this kind of financing" and "had to familiarize ourselves with all the documentation which was unique to V.A. financing." Strauss complained that Banc Corp was not given copies of the leases and said he had never seen a lease transaction where Banc Corp was not furnished with the lease itself (although, it should be said, the Master Purchase Agreement entitled Banc Corp to a copy the lease). He complained as well about the complexity of the billing, the lease payments varying in amount depending on the number of tests performed and Banc Corp splitting the payments between IRIS and the investor banks. But the details of the

### d. Justifiable Reliance

Finally, the evidence at trial showed that BOCT relied on Strauss's omissions and false

representations, and the reliance was justifiable.

For a debt to be nondischargeable under section 523(a)(2)(A), the creditor must have

relied on the debtor's omission or misrepresentation. *Ojeda*, 599 F.3d at 717. Reliance must

have been both actual and justifiable. *Field v. Mans*, 516 U.S. 59, 70 (1995); *see also Westlund*

*v. Casper (In re Casper)*, 440 B.R. 500, 507-08 (Bankr. W.D. Wis. 2010). Actual reliance means

that the omission or misrepresentation was the cause-in-fact of the debt. *In re Mayer*, 51 F.3d

670, 676 (7th Cir. 1995); *Colemichael Invs., L.L.C. v. Burke (In re Burke)*, 398 B.R. 608, 624

(Bankr. N.D. Ill. 2008).[13/] Justifiable reliance raises the requirement beyond bare causation – but

not much. *Ojeda*, 599 F.3d at 717 (noting that the standard is "less demanding" than reasonable

reliance); *Haskell*, 475 B.R. at 922 (stating that the standard "is not considered a difficult one to

meet"). Justifiable reliance requires only that the creditor not "'blindly [rely] upon a

misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to

make a cursory examination or investigation.'" *Ojeda*, 599 F.3d at 717 (quoting *Field*, 516 U.S.

at 71).

---

IRIS transactions and Banc Corp's claimed unfamiliarity with them are red herrings. The fraud
here was straightforward: the double-selling of leases and the false representations the leased
equipment was free of all liens and encumbrances. The outcome in no way depends on the
oddities of the IRIS transactions or of "V.A. financing."

    [13/]     Some courts hold that reliance need not be shown when an omission is involved
because it is "'not possible to rely on facts which have been concealed.'" *Whited v. Galindo (In
re Galindo)*, 467 B.R. 201, 209 (Bankr. S.D. Cal. 2012) (quoting *Loomas v. Evans (In re Evans)*,
181 B.R. 508, 515 (Bankr. S.D. Cal. 1995)), *aff'd*, No. SC-12-1272-BaPaJu, 2013 WL 3389556
(B.A.P. 9th Cir. July 8, 2013). These courts substitute materiality as the causation requirement,
meaning the concealed facts must be the kind to which "'a reasonable man would attach
importance.'" *Evans*, 181 B.R. at 515 (quoting *Titan Grp., Inc. v. Faggen*, 513 F.2d 234, 239 (2d
Cir. 1975)).

The evidence established BOCT's actual reliance. In yet another affidavit Strauss introduced, W.C. Long, Jr., attested that BOCT was never told that any of the leases "had previously been sold," and that had BOCT "known this information beforehand it would not have purchased [them]." Even without the affidavit, the circumstances make BOCT's reliance self-evident: again, no one knowingly buys property from someone who does not own it. Lawrence testified, moreover, that BOCT would not have bought a "reassigned lease" because the original assignee's desire for reassignment "usually shows that there's a problem with the payments." If BOCT would not have bought a reassigned lease, BOCT certainly would not have bought a lease that had already been sold to another bank.

BOCT also relied on the representation in the assignments that the leased equipment was free of all liens and encumbrances. Although Lawrence did not speak directly to BOCT's reliance on this representation, he testified that in buying the leases BOCT relied generally on the assignments Strauss signed, and the circumstances here make clear that BOCT relied specifically on the "free of all liens" representation. Lawrence explained that he made sure that a "UCC filing" accompanied each assignment, that a financing statement "either had been filed or would be filed." So the granting of a security interest plainly mattered to BOCT – and the priority of its lien must have mattered as well. A party granted a subordinate lien rather than a lien with first priority is receiving less and so will ordinarily pay less.

Although the direct evidence of BOCT's actual reliance might have been stronger, direct evidence is not critical. Reliance can also be proved through circumstantial evidence. *First Nat'l Bank of Lansing v. Kreps (In re Kreps)*, 700 F.2d 372, 375 (7th Cir. 1983) ("[B]ecause direct proof of actual reliance is difficult, actual reliance may be proven by circumstantial evidence of reliance."); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 962 (Bankr. N.D.

Ill. 1995); *Kalcheim, Schatz & Berger v. Holtzman (In re Holtzman)*, Nos. 93 B 19410, 93 A

1685, 1994 WL 386845, at *3 (Bankr. N.D. Ill. July 5, 1994); *see, e.g., Krause*, ___ B.R. at ___,

2014 WL 4948146, at *7 (affirming bankruptcy court's finding of bank's actual and justifiable

reliance although no one from the bank testified at trial). The circumstances here warrant a

finding of actual reliance.

BOCT's reliance was also justifiable. Nothing in the documentation Banc Corp supplied

to BOCT for the lease sales made it "readily apparent" that the leases had already been sold to

other banks – or apparent at all. *Ojeda*, 599 F.3d at 717. Similarly, nothing in the

documentation made it readily apparent that those other banks had been granted security interests

in the leased equipment, so that the "free of all liens" representation in the assignments was

obviously false. True, justifiable reliance is a subjective standard dependent on "the

circumstances of [the] particular case and the characteristics of [the] particular plaintiff." *Id.*

The plaintiff here is a bank, more sophisticated than the average person. But a "cursory

examination or investigation," *Field*, 516 U.S. at 71, which was all BOCT had to make, would

not have uncovered the truth. BOCT was entitled to assume that the leases it was buying did not

belong to other banks and the equipment leased was not encumbered with liens.[14]

At least with respect the double sales, Strauss disagrees. He points to the Federal

Offerings Dominique sent to BOCT, each of which disclosed that a certain number of payments

had been collected and in some cases said that the equipment was not new. (The Federal

Offering for the Salt Lake lease for example, disclosed that "11 mo. pmts have been collected"

---

[14]    In particular, BOCT had no obligation to perform UCC searches to ensure the
"free of all liens" representation was true. *Field*, 516 U.S. at 70 (noting that a buyer of land is
justified in relying on the seller's false representation that the land is free of encumbrances even
though the buyer could have "walk[ed] across the street to the office of the register of deeds" and
learned the truth (internal quotation omitted)).

and that "the equipment was new 11 mos. ago.") From these disclosures, Strauss contends,

BOCT should have recognized the leases had previously been sold. Strauss also points to a

February 9, 2005, e-mail from Dominique to "W. Long" (apparently W.C. Long, Jr.) that said:

"there are no pmt issues w/ gallup or va houston. the investor wants pmts direct and the govt is

not getting it through their adm.head to do this so it is being remkt. [*sic*]." Strauss focuses on the

word "remkt" which he claims is short for "remarketed" and indicates the leases were being

reassigned.

In the case of the Federal Offerings, though, Lawrence explained convincingly that he

assumed the references to lease payments already collected signaled only that Banc Corp had

been collecting payments while it was trying to place the leases. He did not conclude that some

other banks to which the leases were sold had been collecting payments. As for the February

2005 e-mail, its meaning is utterly opaque. No evidence was presented about what the e-mail

meant or why it was sent. Strauss offered his own speculations but admitted he was not a party

to the communication. Neither the sender, Dominique, nor the recipient, Long, provided any

enlightenment because neither was called to testify at trial. (Long is apparently deceased and

could not have testified). Banc Corp's transactions with BOCT were not reassignments in any

event. *See* discussion, *supra*, at 24.

Strauss also argues – and this seems to be his major argument – that BOCT's reliance was

not justifiable because the due diligence BOCT performed in connection with the leases it bought

was woefully inadequate. Strauss notes that BOCT never saw the actual leases because Banc

Corp did not send them with the funding letters, although the letters purported to enclose them.

Meanwhile, the documents BOCT did receive were riddled with problems. The funding letters

and accompanying documents referred inconsistently to a host of mysterious identifying

-28-

numbers.[15/] The funding letter for the Albuquerque lease purported to enclose the Salt Lake "Contract" and "Agreement" and listed the numbers for the Salt Lake documents. The assignments of the leases to BOCT referred to the identifying numbers from the subject lines of the funding letters, not to what were apparently the numbers of the leases themselves. The assignment of the Gallup Indian lease referred to a different number altogether and listed Dominique, not BOCT, as the assignee. Had BOCT been paying attention, Strauss suggests, it never would have bought the leases.

Most of this Lawrence satisfactorily explained away. The absence of the leases did not concern him, he said, because in each instance he called the medical center and confirmed the existence of both the lease and the equipment. He did not need the leases themselves. The identifying numbers on the funding letters he assumed to be Banc Corp's own internal numbers and so of no significance. The error in the Albuquerque funding letter, Lawrence said, the parties agreed was simply a typographical error. And as discussed earlier, so was the error in the Gallup Indian assignment, *see* discussion, *supra*, at 10, although Lawrence admitted that BOCT paid for the lease before receiving a corrected assignment and never did receive one.

More important, the adequacy of BOCT's due diligence is irrelevant. Justifiable reliance for purposes of section 523(a)(2)(A) means justifiable reliance on the particular representation or omission at issue. *See Davis*, 638 F.3d at 553; *Ojeda*, 599 F.3d at 717. Although a plaintiff cannot ignore obvious "red flags," *Taylor v. Sykes*, No. 05 C 3717, 2005 WL 3542520, at *3

---

[15/]    To cite a single example, the funding letter for the Salt Lake lease referred in the subject line to "LS# 20050220." The "Salt Lake Agreement" and "Salt Lake Contract" mentioned in the letter, however, had different numbers: "CPRR03-21G" and "V79P-6693A." The assignment to BOCT bore the number 20050220, but other documents in the Salt Lake package bore yet another number: "20030912." The significance of these many numbers was never explained.

(N.D. Ill. Dec. 22, 2005); *Haskell*, 475 B.R. at 922, or "warning signs," *Cutcliff v. Reuter (In re Reuter)*, 427 B.R. 727, 756 (Bankr. W.D. Mo. 2010) (internal quotation omitted), *aff'd*, 443 B.R. 427 (B.A.P. 8th Cir. 2011), *aff'd*, 686 F.3d 511 (8th Cir. 2012), those are red flags or warnings signs that the *specific* representation is false or that *specific* material information has been omitted, *see Taylor*, 2005 WL 3542520, at *3 ("red flags that demand inquiry into the truth of a debtor's assertion"); *Osborne*, ___ B.R. at ___, 2014 WL 5527883, at *7 ("'red flags' [that] raise questions as to the veracity of the representations"). No case holds that a creditor's reliance is less than justifiable when, the fraudulent misrepresentation or omission aside, the creditor was bone-headed to have dealt with the debtor in the first place and would have been better off walking away.

The documentation Banc Corp sent BOCT for the five leases certainly had its problems. Perhaps, given those problems, BOCT should have been more careful and not bought the leases. Perhaps a careful bank would not have dealt with Banc Corp or Strauss at all. But none of that makes any difference here. The critical fact is that none of the supposed "red flags" Strauss identifies in the documents would have given BOCT any reason to suspect either (1) that Banc Corp had already sold the leases to other banks, or (2) that Banc Corp had granted security interests to those banks. BOCT's reliance was justifiable.

### e. Strauss's Liability for Banc Corp's Fraud

Finally, it is worth noting that Strauss is liable for the debt to BOCT although the lease sales were transactions between BOCT and Banc Corp, Banc Corp was a corporation, and Strauss at all times acted as an Banc Corp officer. A corporate officer who participates actively in the fraud of his corporation can be held personally liable, and the resulting debt will be nondischargeable in the officer's bankruptcy case. *Krause*, ___ B.R. at ___, 2014 WL 4948146,

at *8; *Media House Prods., Inc. v. Amari (In re Amari)*, 483 B.R. 836, 848-49 (Bankr. N.D. Ill

2012); *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 468 (Bankr. N.D. Ill. 2011); *Park Nat'l*

*Bank & Trust of Chi. v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001).

### 4. Conclusion

For these reasons, the debt of defendant John Paul Strauss to plaintiff Bank of Commerce

& Trust Co. is declared nondischargeable under 11 U.S.C. § 523(a)(2)(A).  Judgment will be

entered in favor of Bank of Commerce & Trust Co. and against John Paul Strauss on Count I of

the adversary complaint.  Count II of the complaint will be dismissed with prejudice.  Count III

will be dismissed for lack of jurisdiction.  A separate Rule 7058 judgment will be entered

consistent with this opinion.

Dated: December 22, 2014

A. Benjamin Goldgar
United States Bankruptcy Judge